**Hattie Evelyn DILLINGHAM, Executrix of the Estate of Sidney Roberts Dillingham, Deceased, Appellant,**

v.

**Charles W. LYNCH et al., Appellees.**

**No. 12155.**

Court of Civil Appeals of Texas, Austin.

Nov. 20, 1974.

Rehearing Denied Dec. 11, 1974.

J. V. Hammett, Hammett, Hammett, Cavness & Builta, Lampasas, for appellant.

James H. Keahey, Hart, Keahey & Hart, Austin, for appellees.

O'QUINN, Justice.

Appellant brought this lawsuit in June of 1972 in her capacity as independent executrix of the estate of her deceased husband, seeking recovery of funds she alleged were wrongfully withheld from her by lawyers who formerly represented her in probate proceedings relevant to the estate.[1]

Based upon the findings of a jury, favorable to the defendants, the trial court in October of 1973 entered judgment that appellant take nothing, save the sum of $278.-85 previously tendered plaintiff by defendants in an accounting furnished in February of 1972, prior to the filing of suit.

The executrix has appealed and brings twelve points of error. We will overrule all points of error and affirm the judgment of the trial court.

Sidney Roberts Dillingham, out of whose estate this lawsuit stems, died testate on January 14, 1972, leaving an estate valued at approximately $333,000. Dillingham's will named his surviving spouse, Hattie Evelyn Dillingham, independent executrix without bond. Dillingham and his wife had no children, and the estate left by the deceased was half of the community property owned by the couple.

Dillingham was buried January 16, and on the following day, Monday, January 17, Mrs. Dillingham went to the offices of Charles W. Lynch, senior partner in the law firm named defendant in this case, and requested the lawyers to probate her husband's will. Lynch had been attorney for

1. Appellant and plaintiff below is Hattie Evelyn Dillingham, independent executrix of the estate of Sidney Roberts Dillingham, deceased, a resident of Briggs in Burnet County. Defendants below and appellees here are Charles W. Lynch [whose death occurred since submission of this cause on appeal], Alvin Nored, Michael M. Martin, and Pat Millican, individually and as partners, in law firms of Lynch, Nored, Martin and Millican, and Lynch and Nored, all residents of Lampasas in Lampasas County, save Nored, a resident of Burnet in Burnet County.

the Dillinghams about ten or twelve years prior to that time, and had prepared the will to be probated. The will was probated in Burnet County on January 31.

On Friday, prior to the hearing at which the will was probated, Mrs. Dillingham had a second conference with Lynch and another partner, Millican, at which certain business was transacted, the details of which the parties do not entirely agree upon. Both Lynch and Millican testified that at the conference, upon their suggestion, Mrs. Dillingham agreed to place $15,000 in the lawyers' hands which they would use for specified purposes. Lynch and his firm placed the money, delivered to them by check signed by Mrs. Dillingham, in the firm's escrow account in the People's National Bank in Lampasas. The $15,000 was drawn by check from an account in the First National Bank which Mrs. Dillingham and her late husband maintained jointly. That same day Mrs. Dillingham executed a signature card in connection with a new account, in her name only, at the First National Bank. Shortly thereafter, in conformity with their agreement, the lawyers transferred from their escrow account the sum of $3,600 and placed that sum in Mrs. Dillingham's individual account as living expenses estimated to be necessary for her during the ensuing nine months, or until matters of the estate could be brought to a close.

From the escrow account the lawyers also paid funeral expenses of Mr. Dillingham, in the amount of $2,621.15, and drew an additional sum of $8,500 as attorney's fees, leaving a balance, from the deposit of $15,000, in the sum of $278.85.

Mrs. Dillingham testified twice at the trial, and substantial portions of three depositions which Mrs. Dillingham gave prior to trial were admitted into evidence. Although Mrs. Dillingham admitted that the signature on the check for $15,000 "looked like my signature," she denied that she intended at any time to give a check

for $15,000 to her lawyers and stated that she knew nothing about that check until she saw it later, after the First National Bank had paid it. Mrs. Dillingham insisted that she had written a check in the lawyers' office for $5,000, which she later deposited in her new individual account at the First National Bank, and did not write a check for $15,000. In the same course of testimony Mrs. Dillingham admitted that she was "confused on it, I guess. I just don't remember."

It is undisputed otherwise in the record that the $5,000 which Mrs. Dillingham believed she had placed in her individual account for living expenses was the identical sum transferred from a joint savings and loan account at Killeen to the joint checking account she and her husband maintained in the First National Bank at Lampasas. The transfer was effected by memorandum, in response to a telephone call Lynch made to the Killeen association in the presence of Mrs. Dillingham during one of the conferences she had with her attorneys. The purpose of the transfer was to bring the joint account to a balance in excess of $16,000, so that the check for $15,000, needed for the escrow account, could be honored by the First National Bank when presented for payment. The transfer from Killeen was made without loss of interest, although the withdrawal was made a few days prior to normal maturity of the savings certificate.

In connection with these matters, particularly with reference to her belief that she had written a check for $5,000 so that Lynch could place the money in her individual "Evelyn Dillingham" account, Mrs. Dillingham candidly conceded repeatedly that she was confused. Mrs. Dillingham stated, "I don't remember about that [check for $15,000]. But it seems like I had wrote a $5,000 check." Earlier Mrs. Dillingham testified, "I was thinking I gave him [Lynch] a $5,000 check to go in my private account as Evelyn Dillingham. I did write a $5,000 check there, didn't I?" Ultimately, Mrs. Dillingham conced-

ed that the $5,000 deposit to the joint account was not by a check she wrote, but by transfer from the Killeen savings, and was not intended for her individual account for living expenses.

In response to Special Issue No. 1, inquiring whether the jury found " . . . the defendants obtained $15,000 from the plaintiff at the time and on the occasion in question, without her knowledge or consent," the jury answered, "We do not."

By January 31, 1972, the check for $15,000 had been placed in the law firm's escrow account, the disbursements had been made to place $3,600 in the Evelyn Dillingham individual account and to pay funeral expenses amounting to $2,621.15. From this fund the lawyers also drew $8,500 in payment of their "minimum fee" for handling the estate. Out of their fee payment the lawyers advanced $35 as a deposit in probate court and advanced the cost of newspaper legal notices relating to the probate proceedings.

About a week later, on February 8, Mrs. Dillingham had a visit from Jack Montgomery, the husband of Mrs. Dillingham's niece, at Mrs. Dillingham's residence in Briggs. Mrs. Dillingham testified that Montgomery told her " . . . that this check [$15,000] had cleared the First National Bank and he wanted to know about it. . . . He wanted to know if I knew it."

The following morning, on February 9, Mrs. Dillingham went to the First National Bank in Lampasas and talked to the president, Bob Sutton, in his office, where they were joined by Montgomery. Sutton had the check for $15,000 at his desk, as well as records from the two Dillingham accounts in the bank. Sutton testified that Mrs. Dillingham appeared not to understand the deposit slips for $3,600 to her individual account and transfer of $5,000 from the Killeen savings account to the joint account, and that he suggested to Mrs. Dillingham she might find out about

the $15,000 check by calling Lynch, which he said she declined to do. Sutton also testified that Montgomery had visited him at the bank prior to the visit from Mrs. Dillingham on February 9, and after looking at the Dillingham accounts, tentatively set up the subsequent meeting between Sutton and Mrs. Dillingham, at which Montgomery was present.

From Sutton's office Mrs. Dillingham went directly to a meeting with J. V. Hammett, her attorney in this cause, whose office was in the same building, immediately above the bank. At that meeting Hammett prepared a letter, which Mrs. Dillingham signed, addressed to the Lynch law firm advising that effective immediately that firm's employment was terminated and demanding repayment of "all funds obtained" from her, "together with a complete accounting for the same." Mrs. Dillingham also requested Lynch and his associates to "make no attempt to communicate directly with" her, but to handle all matters through the Hammett firm.

Two days later, on February 11, Lynch delivered to Hammett all records, abstracts, and working papers pertaining to the Dillingham estate, together with a letter giving an account in full of payments out of the $15,000 escrow money, including a check for $278.85 tendered to Mrs. Dillingham as the balance, after deposit of $3,600 to Mrs. Dillingham's personal account, payment of $2,621.15 to the funeral home, and payment of $8,500 on the attorney's fee.

Nearly four months later, on June 8, 1972, appellant brought suit against Lynch and his partners "for the funds received by said defendants and wrongfully withheld from her by them . . . and for accounting . . . ." The accounting previously made by Lynch on February 11, showed all of the $15,000 in the escrow account to have been paid to Mrs. Dillingham, or for her benefit, except $8,500 retained as attorney's fee. At the trial, when asked whether she agreed "that the

only thing left in dispute here is the propriety of the $8,500 legal fee," Mrs. Dillingham replied, "That is what the suit is about."

Mrs. Dillingham testified that although she expected to pay the Lynch firm a fee for legal services, there was no discussion regarding a fee and no agreement was made as to any amount for legal services in handling the estate. In direct conflict with this testimony is the testimony of both Lynch and Millican on the subject of attorney's fee.

Lynch testified that he advised Mrs. Dillingham that the firm's minimum fee would be $8,500, calculated on the basis of three percent of the estimated value of the estate. In connection with the fixing of a minimum fee, Lynch explained to Mrs. Dillingham, he testified, that burial expenses should be paid and estimated living expenses for Mrs. Dillingham should be set aside in a checking account, separate from the joint account, in order to simplify administration of the estate. Lynch testified that Mrs. Dillingham agreed to the entire plan, including payment of a minimum legal fee of $8,500.

Millican testified that he was present at the conference between Lynch and Mrs. Dillingham, which was on January 28, 1972, the second meeting with appellant after her husband's death. Millican's testimony was in all essentials in accord with Lynch's recollection of the discussion with Mrs. Dillingham regarding the legal fee of $8,500 and in regard to the other business matters connected with the estate. As a result of this planning, Millican stated, it was found that the money talked about would total about $15,000, after which Mrs. Dillingham gave her check for that sum, to be paid out of the joint account. Millican was present when Lynch called the savings and loan association at Killeen by telephone, with approval of Mrs. Dillingham, to arrange transfer of $5,000 to the joint account in Lampasas in order to bring the balance to a total in excess of $16,000, more then enough to cover the $15,000 check given for the escrow account.

In response to Special Issue No. 2, inquiring whether ". . . on or about January 28, 1972, Mrs. Dillingham orally agreed with Defendants that the Defendants' fee for representing the S. R. Dillingham Estate would be at least $8;500.-00," the jury replied, "She did so agree."

■ Under points 5, 6, 7, and 8, appellant contends that the evidence does not support the jury's answers to Special Issues 1 and 2. As already noted, in answering these issues the jury failed to find that Lynch and his firm obtained the $15,000 from Mrs. Dillingham without her knowledge or consent, as she contended, and that Mrs. Dillingham did agree that the legal fee for representing her husband's estate would be at least $8,500. As plaintiff below, it was Mrs. Dillingham's burden to prove by a preponderance of the evidence that the Lynch firm obtained the $15,000 from her without her knowledge or consent and that she did not agree to pay the firm a fee of $8,500.

Although Mrs. Dillingham's testimony tended to support these contentions, even when reasonable allowance is made for the conflicts and inconsistencies in her statements, the testimony of both Lynch and Millican contradicts in every essential detail appellant's version of transactions related to the $15,000 escrow fund and agreement to pay the lawyers a fee of at least $8,500. The jury, in the exercise of its prerogative, chose to believe the testimony of Lynch and Millican.

Appellant contends on appeal ". . . that the admissions and statements of appellee Lynch, coupled with the perjury he commited [sic] upon the trial of this case conclusively establish as a matter of law and as a matter of fact that there was no agreed cash fee of $8,500 to be paid to them on January 28, or January 31, or at any other time."

The "admissions and statements" of Lynch referred to by appellant consist of statements found in Lynch's letter of February 11, 1972 to the Hammett firm, two days after receiving Mrs. Dillingham's letter, in which she advised that she had discharged Lynch and employed Hammett, and by which she asked Lynch for an accounting of the $15,000.

In that letter Lynch gave a full accounting, including $8,500 as "Fees to date," and stated that his firm had complied with the minimum fee schedule of the State Bar of Texas, which he understood to be used in Burnet County where the estate would be administered. Lynch added that his firm's work was "99% complete" at that time and that although the fee "should be $9,579.75," the firm "after conference decided to accept $8,500.00 for services to date."

Appellant contends that because the letter was silent as to an agreed fee, and the fact of an agreement was not pleaded in the Lynch firm's initial answer (a general denial), and was pleaded for the first time in an amended answer filed about seven months after suit was brought, it was "conclusively established" that the Lynch firm did not, at the time the firm was discharged, "claim any kind of express contract" with Mrs. Dillingham for a fee.

■ It is our view that lack of assertion of a fee agreement by Lynch, in his letter of accounting to the Hammett firm, and subsequent delay in affirmatively pleading an agreement, do not constitute an admission that no agreement actually existed. Nor can it be said reasonably that Lynch's failure to mention a fee agreement in his letter of accounting constituted evidence in conflict with the testimony of Lynch and Millican at the trial that there was an agreement with Mrs. Dillingham. The contention made on appeal is merely argumentative of a position which counsel for appellant could have argued properly to the jury did *not* argue.

The attack by counsel for appellant on the veracity of Lynch, charging him with having committed perjury at the trial, is without merit and is not justified by the record. During cross examination of Lynch at the trial, Hammett asked Lynch whether he recalled a certain telephone conversation between the two men about the disputed legal fee. Lynch stated that he did not remember such conversation.

Hammett then read to Lynch a short passage from what purported to be a transcription of a tape recording made by Hammett, without Lynch's knowledge, of a telephone conversation. Lynch denied that he had made the statement Hammett attributed to Lynch as shown, Hammett said, by the transcription held in counsel's hand at the time. No portion of the purported transcription was offered in evidence, and the complete transcript appears in the record only by reason of having been offered by Hammett later in support of appellant's motion for a new trial and as contained in a bill of exception.

Lynch was never accorded an opportunity during the trial to examine the transcript or to explain his statement to Hammett if on reading the transcript Lynch should recall the conversation and admit that it took place.

The fragmentary portion of the conversation upon which appellant bases a charge of perjury is the statement Lynch purportedly made that, "Of course, she's going to be upset about our fee, but as far as we're concerned, that's what it's going to be, and if she wants to do something about it, she can." The record shows that introduction of the transcription at the trial would have disclosed that the next statement by Lynch to Hammett was, "Because that was our agreement with her husband, so—" which was interrupted by Hammett without opportunity for Lynch to state fully any arrangements or agreements the firm had with the deceased and his wife regarding legal fees.

It is undisputed that Lynch had been handling legal matters for the Dillinghams for ten or twelve years prior to Dilling-

ham's death. Lynch testified that for five years prior to the death of Sidney Roberts Dillingham the Lynch firm had worked closely with the couple making their estate plans in contemplation of death. Lynch had written Dillingham's will, a document comprising eighteen pages and making bequests to about forty devisees, for which Lynch charged only twenty-five dollars. Lynch performed many other services in the course of the estate planning, particularly during the last five years of Dillingham's life, for which no fee was charged.

Lynch testified that his agreement with Dillingham, at the time the will was rewritten the last time, was to " . . . put it on the cuff and someday when my [Dillingham's] estate comes, take care of it. That was the deal. . . . My partners weren't too happy about it, but that was the deal I had . . . Mr. and Mrs. Dillingham. They both were there and both knew that and both thanked me."

We reject the contention that Lynch committed perjury. If there appeared to be an inconsistency between statements Lynch made, the record demonstrates that he was denied access to the transcription, which was not introduced into evidence, and had no opportunity to refresh his memory and make a full and consistent statement of the truth. The proper method of showing prior contradictory statements of a witness, by which a predicate is laid and the witness is accorded an opportunity to disprove or admit and explain the statement, is well established in Texas practice. See McCormick and Ray: Evidence, sec. 692, and cases cited. None of these steps was taken at the trial of this case in behalf of appellant.

As already observed, neither the taped telephone conversation between Hammett and Lynch on February 11, 1972, nor transcription of the tape, was introduced at the trial. Counsel for appellant sought to introduce the tape later, for the first time, at a hearing on motion for new trial. The court excluded the tape as not constituting newly discovered evidence. The conversation in full is before this Court as part of appellant's bill of exception.

■■ The trial court properly excluded the tape at the hearing on motion for new trial, as the record shows that Hammett made the tape which he admittedly concealed from Lynch and associates, and kept the tape in his safety box at the bank until the morning of the hearing on motion for new trial. To justify the grant of a new trial based on a claim of newly discovered evidence, there must be a showing, among other things, that the evidence was unknown to the movant before trial, that failure to discover the evidence was not due to want of diligence, and that the materiality of the evidence was such as probably would bring about a different result on another trial. Gonzales v. Diaz, 424 S.W.2d 314, 315 (Tex.Civ.App. El Paso 1968, no writ) and authorities there cited.

The trial court did not abuse its discretion in denying new trial on the basis of the evidence to be found in the tape.

We overrule appellant's points 5, 6, 7, 8, and 11, under which the contentions, which we have considered and decided against appellant, are advanced.

■ Appellant complains, under points 3 and 4, that the trial court erred in overruling appellant's objection to the charge for failure to include a special issue, with the burden on appellees to show that their fee contract was fair and reasonable, it being undisputed that the agreement was made during a relationship of attorney and client; and that without such issue, the issues answered by the jury, will not as a matter of law support the judgment. We overrule these points.

Appellant admitted at the trial that the only element of accounting in dispute was the amount for attorney's fees, on which theory of recovery appellant offered no evidence, and all the testimony of credible weight on the issue was to the effect that the fee of $8,500 was fair and reasonable, and had been earned by the Lynch firm. Lynch and Millican testified as to the serv-

ices performed in connection with the Dillingham estate, and the complete file, with working papers and correspondence, was introduced into evidence. In addition, three practising attorneys having a total of 65 years' experience in the law, testified from their examination of the Dillingham file that in their respective opinions a fair and reasonable fee for legal services reflected by the file would range from eight to ten thousand dollars. The county judge of Lampasas County, with 48 years in the law, testified that in his opinion, based on examination of the file, a fair fee in the matter would be "between nine and ten thousand dollars."

Mrs. Dillingham was the only witness for appellant on the question of whether the fee was fair and reasonable. She testified that she did not know what work had been done by the Lynch firm, and had made no attempt to determine what had been done by talking to Lynch or any member of his firm. It would appear that there was no issue to go to the jury on whether the fee was fair and reasonable.

■ But even if an issue existed under the evidence, appellant waived a jury verdict on the issue. At the trial appellant made objection to the charge in general terms but did not tender a proposed special issue worded properly to elicit an answer from the jury. Appellant insists that a suggested special issue was not needed because the burden of proof as to fairness of an attorney's fee rests on the attorney under the rule found in Archer v. Griffith, 390 S.W.2d 735 (Tex.Sup.1964).

Since the issue was part of appellant's theory of recovery, it was required of appellant that request for submission include the issue in substantially correct form, even though the burden of proof was upon appellees. McDonald: Texas Civil Practice, vol. 3 (1970), sec. 12.32.2; Republic Bankers Life Insurance Co. v. Herring, 463 S.W.2d 743 (Tex.Civ.App. Waco 1971, no writ).

Under points 9 and 10 appellant complains of improper argument to the jury by counsel for appellees, which, appellant contends, "was so inflammatory and prejudicial that it required no objection" at the time the argument was being made.

■ The general rule is that for a party to be entitled to a new trial because of improper argument of counsel, it must be shown that objection was made and overruled at the time argument was made. Texas Employers' Insurance Assn. v. Haywood, 153 Tex. 242, 266 S.W.2d 856, 858 (1954). In *Haywood* the Supreme Court recognized the soundness of the rule and pointed out that " . . . ordinarily a litigant will not be permitted to lie in wait, taking a chance on a favorable verdict and, being disappointed, complain of improper argument for the first time in a motion for new trial." Only when the probable harm or the resulting prejudice cannot be eliminated or healed by retraction or instruction will a new trial be awarded in the absence of objection timely made. (266 S.W.2d 858, col. 2)

■ In Texas practice, following adoption of Texas Rules of Civil Procedure, rules 434 and 503, the rule of presumed prejudice may no longer be applied to improper argument. Appellate Procedure in Texas, Harmless Error, sec. 17.-15[2]; see also Aultman v. Dallas Railway and Terminal Co., 152 Tex. 509, 260 S.W.2d 596, 600 (1953). It is settled that before a judgment will be reversed because of argument of counsel the record must show (1) the argument was improper and (2) was such as to satisfy the reviewing court that it was "reasonably calculated to cause and probably did cause the rendition of an improper judgment." Aultman v. Dallas Railway and Terminal Co., *supra,* 260 S.W.2d 599, col. 2.

■ Appellant complains of the entire argument of counsel for appellees, "but further particularly complains of the following statements:

"(1) 'This is not a dispute between Mrs. Dillingham and Charlie Lynch,' . . . 'the suit has been brought for her for another purpose' . . . 'So this is not a

case between Charlie Lynch and Mrs. Dillingham . . . this is a case between Charlie Lynch and J. V. Hammett . . .'

(2) ('Her confusion has been seized upon here to allow Mr. Hammett to get at Mr. Lynch')

(3) 'Mr. Hammett had his day in court. He had had all the questions he could ask of Charlie Lynch and badgered him as much as he could.'

(4) '. . . all I can say once again is, this is not a squabble between Charlie Lynch and Mrs. Dillingham . . . but as I say, this suit is not about money, its about something else . . . we are here not for monies [sic] sake; we are here for the honor of Charlie Lynch."

The record shows that Lynch and Hammett were partners in the same law firm for a period of several years, and that the firm was dissolved early in January of 1968. In the course of cross examination of Lynch at the trial, Hammett developed the fact that Mrs. Dillingham and her husband were clients of that firm and that Lynch met the Dillinghams at that time. Hammett also brought out the fact that Mr. Dillingham relied primarily on Hammett for legal services until about September of 1957, when Dillingham switched to Lynch. In a heated exchange between Hammett and Lynch, while Lynch was on the witness stand, it was shown that the split between Hammett and Dillingham came after a difference between them growing out of "a very violent argument . . . over the School Board." Lynch then testified, without contradiction, that Dillingham "came to me [Lynch] exclusively after that." It is undisputed that for ten to twelve years prior to Dillingham's death, Lynch was attorney for the Dillinghams, the couple having continued with Lynch after he left the Hammett association in 1968 and formed the firm whose members were defendants in this case.

The argument of counsel for appellees had obvious reference to the circumstances under which the Lynch firm was discharged by Mrs. Dillingham and the Hammett firm was employed, after which this lawsuit was filed to recover the legal fee already paid the Lynch firm for its services.

Mrs. Dillingham testified that Jack Montgomery, the husband of her niece, called at her home in Briggs and said he wanted to known about a check for $15,000 that had cleared the First National Bank. Mrs. Dillingham said she was not "excited" about the check, but agreed to go to the bank next morning and see about it. At the bank next morning the president, Bob Sutton, and Montgomery were waiting for her, and Sutton had the check and her account records at his desk. Sutton testified that he and Montgomery had examined the account the day before, and Montgomery at that time tentatively set up the meeting for next morning with Mrs. Dillingham. Mrs. Dillingham testified that she had not authorized either Montgomery or Sutton to go into her account and knew nothing about their looking at the account until they told her later.

It was at the meeting with Sutton and Montgomery that arrangements were made by Sutton over the telephone, for Hammett to see Mrs. Dillingham upstairs in Hammett's office. The record shows that Hammett was a director in the First National Bank; that the money transferred from the Dillingham account in the First National Bank went into Lynch's escrow account in the Peoples National Bank; and that Hammett was attorney for the First National Bank. Mrs. Dillingham left Sutton's office and went directly to Hammett's office upstairs, where Hammett dictated a letter to Lynch discharging that firm which Mrs. Dillingham signed. Mrs. Dillingham was joined by Sutton and Montgomery in Hammett's office and witnessed her signature to an instrument suitable for recording prepared by Hammett, giving notice that Mrs. Dillingham had discharged the Lynch firm, which instrument Hammett caused to be filed with the Probate Court that day in Burnet County.

Two days later, on February 11, by letter to Hammett's firm, Lynch made the accounting Mrs. Dillingham asked for and began delivering to Hammett files and records pertaining to the Dillingham estate. Mrs. Dillingham testified that she did not see the letter of accounting Lynch sent to Hammett and that she did not discuss the letter with Hammett before this lawsuit was filed in June.

Counsel for Mrs. Dillingham argued to the jury the theory that Lynch's firm had obtained the $15,000 without Mrs. Dillingham's knowledge or consent and that the defendants were wrongly withholding the money. Counsel for the appellees argued a contrary theory that Mrs. Dillingham, a recent widow aged seventy-four, was confused, and that her confusion had been played upon to induce her to change lawyers abruptly, without prior inquiry of Lynch and his associates, and without according them the opportunity to give a complete and proper accounting for the $15,000, which they would have been able to do if given the chance.

Upon examination of all the evidence, we conclude that the argument of counsel for appellees was within the record, and, being a fair comment on the evidence, was proper under Rule 269, Texas Rules of Civil Procedure. Having decided that the argument was not improper, we do not reach the question of whether the argument was reasonably calculated to cause and probably did cause the rendition of an improper judgment.

Appellant complains under points 1 and 2 that the trial court erred in striking appellant's first amended first supplemental petition and in proceeding to trial upon overruling appellant's motion for continuance. We will overrule these points.

The case was set originally for trial on May 14, 1973, and at that time a jury was selected, after which a mistrial was ordered. The cause was reset for trial July 30, 1973, but trial was postponed to Monday, September 17, 1973. On Monday prior to trial date appellant filed her First Amended First Supplemental Petition, the date of such filing being September 10. Leave of the court was not obtained, and appellees promptly objected to the filing for failure to comply with the requirement of Rule 63, Texas Rules of Civil Procedure, and moved to strike appellant's pleading. The court sustained appellees' motion, and the case went to trial on the same pleadings as before, consisting of Plaintiff's Original Petition and First Supplemental Petition and Defendants' First Amended Original Answer.

Appellant contends that the amended pleading was filed "On the 8th day prior to the then existing trial date," and relies on the holding of this Court in Oehler v. Oehler, Tex.Civ.App., 422 S.W.2d 240, 244, Austin 1967, writ ref. n. r. e.). The holding in *Oehler* is contrary to appellant's position.

In that case the cause was set for trial on Monday, March 27, 1967, and the contested pleading, filed without leave of the court, was filed on Monday, March 20, 1967. Thus it is clear that in *Oehler*, as in this case, the pleading was filed on a Monday before trial on the following Monday. Such filing falls "within seven days of the date of trial," the period named in Rule 63 within which leave of the court first must be obtained. In *Oehler* this Court construed Rule 4 with Rule 63, and stated, "We construe the words 'within seven days' to mean 'seven days before' and that Rule 4 . . . requires that the date of trial be included in computing this period, although the date the amendment is offered for filing shall not be included." (422 S.W.2d 244)

It was within the discretion of the trial court to grant or refuse the right to file the amended pleading within the seven day period, and the trial court's decision will not be disturbed on appeal unless there is a clear showing of abuse of discretion. Box v. Associates Investment Company, 389 S.

W.2d 687, 689 (Tex.Civ.App. Dallas 1965, no writ). Appellant has made no showing of abuse of discretion or of substantial injury as a consequence of the pleading being struck by the trial court.

In this connection appellant complains that the court erred also in denying the motion for continuance, which in itself stated no ground for continuance but merely recited the action of the court in striking the amended pleading. The trial court acted within its discretion in refusing further delay and denying continuance of the cause.

Under the twelfth and final point of error appellant contends that errors in the trial "constitute cumulative error, preventing appellant from receiving a fair and impartial trial and preventing substantial justice being done in this case." Finding no error requiring reversal, we overrule this point of error without further discussion.

The judgment of the trial court is in all things affirmed.