Opinion issued August 5, 2021



In The

# Court of Appeals

For The

# First District of Texas

———————————————

## NO. 01-18-00425-CV

———————————————

**HANI HAFIZ IBRAHIM QUTIEFAN, Appellant**

**V.**

**LUBNA ABDELZIZ SAFI A/K/A LUBNA AZIZ SAFI, Appellee**

---

**On Appeal from the 505th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 13-DCV-206211**

---

## MEMORANDUM OPINION

Appellant, Hani Hafiz Ibrahim Qutiefan, appeals the trial court's entry of a final divorce decree after a bench trial and the denial of his motion for new trial. In five issues, Qutiefan argues that the trial court erred in (1) denying his requests for

appointment of counsel at trial; (2) denying his motions for continuances to hire trial counsel; (3) denying his right to present testimonial and documentary evidence; (4) appointing appellee, Lubna Abdelziz Safi a/k/a Lubna Aziz Safi, as sole managing conservator and Qutiefan as possessory conservator of their minor children; and (5) dividing the marital estate.[1] We affirm.

## Background

Qutiefan and Safi were married in a religious ceremony in Palestine in September 1994. In December 1997, they moved to Houston and were married in a legal ceremony. They also bought a house in Houston. During their marriage, the parties had five children. The parties' four youngest children are permanently disabled. In August 2011, the parties separated. Safi and all five children moved out

---

[1] Without leave of Court, Qutiefan filed an amended brief on the date this appeal was set for submission. *See* TEX. R. APP. P. 38.7 ("A brief may be amended or supplemented whenever justice requires, on whatever reasonable terms the court may prescribe."). Generally, "a party must seek leave of court to file an amended or supplemental brief, and the appellate court has some discretion in deciding whether to allow the filing." *Palma v. Harris Cty. Appraisal Review Bd.*, No. 01-17-00705-CV, 2018 WL 3355052, at *1 (Tex. App.—Houston [1st Dist.] July 10, 2018, pet. denied) (mem. op.) (quoting *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 65 (Tex. 1998)). Because Qutiefan did not seek leave to file an amended brief, we construe his amended brief to be a reply brief. *See id.* (construing amended brief as reply brief where party did not seek leave to file amended brief). A reply brief may address any matter raised in the appellee's brief, but a reply brief may not raise new issues for the first time. TEX. R. APP. P. 38.3; *see Fallon v. MD Anderson Physicians Network*, 586 S.W.3d 58, 73 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (refusing to consider new issue raised for first time in reply brief). To the extent Qutiefan's amended brief raises new issues not included in his original brief, we decline to consider those new issues.

of the parties' house, where Qutiefan continued living through the end of trial in August 2017. Their oldest child turned eighteen years of age prior to trial and was not part of the divorce proceedings.

In May 2013, Safi filed an original petition for divorce from Qutiefan on the grounds of insupportability and cruel treatment. She alleged that Qutiefan had a history of committing family violence in the preceding two years, and she supported her petition with a family violence protective order issued against Qutiefan in October 2011. Safi requested that, based upon Qutiefan's history and pattern of committing family violence, the court appoint her as sole managing conservator of the parties' four youngest children and that Qutiefan's access to the children be limited to one hour on one Saturday each month with seven days' notice from Qutiefan. She requested $1,500 per month in child and medical support for the children to continue indefinitely based on the children's disabilities, retroactive child and medical support, and spousal support.

Safi also asked the court to order the sale of the parties' home and to award her 60% of the proceeds of the sale and Qutiefan 40% of the proceeds. She requested that the court award Qutiefan a homeowner's association ("HOA") judgment against her, and she asked that the court award each party their own vehicles, bank accounts, and debt. She also requested an award under a dowry contract between her and Qutiefan. Finally, Safi requested a permanent injunction and, pending trial,

temporary orders requiring Qutiefan to pay child support, health insurance and uninsured medical expenses for the children, and all bills and expenses related to the parties' house.

Qutiefan filed an answer. He also filed a counterpetition, which was signed by an attorney Qutiefan hired and which largely mirrored Safi's petition. Qutiefan's counterpetition relied on the same grounds for divorce—insupportability and cruel treatment—as Safi's petition, and similarly asked the court to appoint Qutiefan as sole managing conservator and to deny or limit Safi's access to the children. Like Safi's petition, Qutiefan's counterpetition requested indefinite child and medical support for the children. Qutiefan also requested a similar division of property, but he added a claim for reimbursement of the community property used to benefit Safi's separate estate. The counterpetition asked for a temporary injunction, which included a lengthy list of prohibited actions, and a temporary order appointing him sole managing conservator of the children through trial and requiring Safi to pay child support and health insurance premiums for the children.

Prior to trial, Qutiefan filed more than forty motions and an interlocutory appeal, which this Court dismissed for want of jurisdiction. *See generally Qutiefan v. Safi*, No. 01-17-00925-CV, 2018 WL 1189667 (Tex. App.—Houston [1st Dist.] Mar. 8, 2018, no pet.) (per curiam) (mem. op.). He filed six motions to invoke his Sixth Amendment constitutional right to appointment of counsel, which the trial

court denied. He also filed three motions to continue the trial, none of which were based on a need to obtain counsel. The trial court denied his motions but continued the trial date several times for other reasons. Qutiefan also filed a motion for preparation of a social study and for psychological evaluations of the parties and their children, both of which the trial court granted but later set aside when Qutiefan had not scheduled or paid for either the study or any psychological evaluations.

On Safi's motion, the trial court entered an enforcement order, finding that Qutiefan had violated temporary orders by failing to pay more than $14,000 in temporary child support for thirty-five months pending trial. The court held Qutiefan in criminal and civil contempt, but the court suspended commitment, placed Qutiefan on community supervision, and ordered him to pay monthly arrearages in addition to current child support. The order also required Qutiefan to pay Safi's attorney's fees for bringing the enforcement action.

While this case was pending, the Office of Attorney General filed an original petition in a suit affecting the parent-child relationship ("SAPCR") seeking retroactive and ongoing child and medical support for the parties' children. The Attorney General's SAPCR was consolidated into the divorce proceedings underlying this appeal.

After nearly two years of continuances, the bench trial commenced on July 13, 2017. Trial occurred for seven days over a five-week period on July 13, July 18,

August 15, August 16, August 17, August 21, and August 22, 2017. Qutiefan appeared pro se, Safi appeared with counsel, and the Attorney General appeared through counsel.

Safi testified for the first four days of trial. Qutiefan cross-examined her for three days and re-cross-examined her on a fourth day. Safi testified that Qutiefan physically and verbally abused her while they were married, including by cursing at and hitting her in front of the children. Afterwards, Qutiefan would take her phone away and hide it. At least once, one of their daughters tried to intervene in the abuse and Qutiefan pushed her away. Safi testified that Qutiefan would threaten her with imprisonment and death, and he would leave her voicemail messages telling her she was "sick, mentally sick" and not normal. She testified about and introduced two protective orders against Qutiefan: the one that issued in 2011 and was effective for two years, as discussed above, and a second one that issued in 2013 and was also effective for two years. Safi had reported Qutiefan for violating the protective orders, but the cases against him were eventually dismissed. She also testified that she had a protective order issued against Qutiefan in 2008, and that she had sought a fourth protective order against Qutiefan, which was denied. Safi characterized her marriage as "miserable" and stated that she did not feel safe around Qutiefan.

She also testified about the children's disabilities. The parties' second and fifth children have Usher's syndrome, which Safi described as an incurable genetic

6

disease that affects the children's abilities to see and hear such that they require cochlear implants and walk with canes. The youngest child also suffers from seizures. The parties' third and fourth children have autism. Safi introduced documents showing the children's diagnoses, and she testified that the children would be disabled for the rest of their lives. The children receive social security benefits and Medicaid based on their disabilities. All five children lived with Safi continuously from the parties' separation through trial, and Safi testified that she had provided exclusive care for the children since the separation. She testified that Qutiefan did not provide for her or the children while the parties were married or since their separation.

Safi also testified that Qutiefan does not know how to take care of the children and that his house is in very bad condition. Safi testified that Qutiefan had last seen the children in September 2016 because he did not request visitation and that Qutiefan often would not show up at the designated meeting place to pick up the children. When the children had visited Qutiefan the few times since the separation, Safi testified that they returned upset and told her that Qutiefan slept a lot and kept no food in the house, that the air conditioning did not work, and that the house was dirty. Safi conceded, however, that she believed the children would be safe when visiting Qutiefan. Safi testified that the children's conditions had improved since the separation.

7

Safi testified that she does not work and that her only source of income is the four youngest children's social security benefits and food stamps. She introduced a financial information sheet showing her lack of income. She said that she has a bachelor's degree in social work from a university in Jerusalem. She testified that Qutiefan worked as an accountant out of the parties' home. Qutiefan's financial information sheet stated that he earned $600–900 per month but had more than $2,000 in monthly expenses as well as significant debt. His tax returns showed his income at approximately $13,000 per year. However, Safi testified that she believed Qutiefan earned more than his financial information sheet and tax returns reflected because he was often paid in cash and his monthly expenses were more than double his reported income. Prior to their separation, Safi saw Qutiefan receive cash from clients.

The parties bought a house while they were married, and Qutiefan lived there from the time the parties separated through trial. The deed and mortgage on the house were solely in Safi's name, but Qutiefan paid the mortgage. Safi introduced an inventory and appraisement showing approximately $16,000 of equity in the house, and she introduced a document from the Fort Bend Central Appraisal District showing the house's appraised value for tax year 2017. The house was damaged during Hurricane Ike in 2008 and the parties received a $23,000 check from the insurance company, which Qutiefan made Safi cash. Qutiefan took the money but

8

did not spend it to repair the house. The parties received a second insurance check for $10,000 for additional damage to the house. Safi had the uncashed check in her possession. Because of hurricane and other damage to the house, the homeowner's association had assessed numerous citations for HOA violations, including for a damaged front door, cars in the driveway, and failing to maintain the yard. When the violations went unpaid, the HOA obtained an $8,000 judgment against Safi. Safi introduced the judgment into evidence.

Safi also testified about the parties' separate property. She owned two vehicles, including one that she had recently purchased for her oldest daughter from a lump sum child support payment she had received from Qutiefan. She had one bank account with a few hundred dollars in it, her and her children's clothing, and other household items. She testified that she had a dowry contract with Qutiefan, which she described as: "when a woman gets divorced, her husband has to pay that money that's listed on the document." The only evidence of the dowry was a Palestinian marriage certificate, translated into English, that stated a dowry existed. Safi's request for relief during trial mirrored her pretrial requests for relief as discussed above.

The trial court gave Qutiefan wide "latitude" in his pro se cross-examination of Safi, often allowing him to ask questions over Safi's objections. When Safi attempted to refuse to answer Qutiefan's question about the contents of a safety

deposit box, the trial court ordered Safi to answer and admonished her that she could be held in contempt for not answering. She answered the question. Qutiefan lodged numerous legal objections to Safi's testimony, many of which were sustained. He also repeatedly objected to Safi's testimony by claiming it was false and attempting to testify to his own version of the facts. The trial court overruled these objections and told Qutiefan that he would have an opportunity to testify. Beginning on the third day of trial, Qutiefan also repeatedly requested continuances, arguing that he needed additional time to hire counsel because he was unable to represent himself. The trial court denied his motions. The court told Qutiefan that trial was initially set for November 2015 but had been reset several times until July 2017. In addition, the court noted that trial took place on various days over a five-week period, thus affording Qutiefan additional time during trial to hire legal counsel.

Safi's attorney testified regarding her attorney's fees, and Qutiefan cross examined her. Counsel answered all of Qutiefan's questions except those to which she objected on the basis of attorney-client privilege, which the trial court sustained.

On the fourth day of trial, Qutiefan asked for a continuance because he was ill. The court continued the trial until the following Monday and ordered Qutiefan to provide a doctor's note. The record indicates that the doctor's note showed no malady.

During his case in chief, Qutiefan testified in narrative form. He accused Safi of lying about "whatever she claims in the divorce" and lying to obtain the protective orders against him. He said Safi has "mental and psychological issues that's causing this divorce." He admitted that his children are disabled, and he testified that Safi only wants custody of the children so she can receive their social security benefits and food stamps. He said Safi alienates the children, brainwashes them against him, and bad mouths him in front of them. He testified that he handled the children's medical issues before the parties separated and that their conditions had worsened since then. He denied committing family violence against Safi or the children.

Qutiefan further testified that Safi abandoned the parties' house and refused to fix it. He said that he cashed the first insurance check for damages to the house from Hurricane Ike, but Safi spent the money and emptied the parties' bank accounts. He testified that he had to borrow money to fix the house. However, he also testified that, at the time of trial, the roof had holes in it and the house had water leaks and missing flooring. He introduced photographs showing the condition of the house. He also conceded that he had not paid any of the fines assessed by the HOA.

In the middle of his testimony, Qutiefan called his uncle, Ziad Alkhateeb, as an out-of-order witness. Safi objected because Qutiefan had not produced a witness list. Although Qutiefan could not prove he had produced a witness list, the court allowed Alkhateeb to testify. Alkhateeb said that he would meet Safi to pick up the

11

children to visit Qutiefan but Safi usually would not bring all the children with her. When Safi did not bring all the children, Alkhateeb called the police to report her. When she did bring the children, Alkhateeb testified that they were "happy [and] excited" to see Qutiefan. Alkhateeb denied knowing whether Qutiefan had ever abused Safi. He testified that he owned a construction company and had spoken to Safi about repairing the house but she did not cooperate. He said Safi would get mad at him for not spending the insurance proceeds on materials to repair the house. He eventually lent Qutiefan money to repair roof leaks in the house, and he testified that other family members had also lent Qutiefan money.

Qutiefan introduced more than thirty exhibits during trial, many of which were not admitted because they lacked a proper predicate. The trial court told Qutiefan he could attempt to readmit the exhibits. The court did admit some of Qutiefan's exhibits, including a text message from Safi in Arabic, photographs of damage to the parties' house, and Qutiefan's financial information sheet.

Both parties gave a closing statement. At the end of trial, the court granted the divorce and took the parties' various requests under advisement.

The trial court entered a final divorce decree on February 28, 2018. The decree appointed Safi as sole managing conservator and Qutiefan as possessory conservator of the children. Qutiefan was allowed visitation with the children on specific weekends each month from 10 am to 6 pm each day so long as Qutiefan gave Safi

12

seventy-two hours' notice of his intent to exercise a possessory period. The decree awarded Safi $391 per month in child support for the four youngest children for an indefinite period of time. The decree further ordered Safi to maintain Medicaid for the four youngest children and denied additional medical support from Qutiefan except that the parties were required to split non-reimbursable health care expenses.

The decree awarded the parties' house to Safi but ordered her to sell it. Safi was awarded 60% of the net proceeds from the sale and Qutiefan was awarded the remaining 40% of the net proceeds. The decree also awarded Safi the uncashed insurance check in her possession and required her to use the proceeds on repairs to the house before selling it. The decree awarded the HOA judgment against Safi to Qutiefan. It further awarded Safi's two vehicles to her, and it awarded each party the cash in their possession, clothing, jewelry, and personal effects. Each party was awarded their own debt. The decree denied spousal maintenance, recovery for the dowry contract, and injunctive relief. Finally, the decree awarded Safi her attorney's fees.

Qutiefan filed a motion for new trial, which was signed by a retained attorney. Qutiefan briefly challenged the trial court's denial of his requests for continuances

to secure funds to hire counsel, and he primarily challenged various findings in the divorce decree. The trial court denied the motion. This appeal followed.[2]

## Appointment of Counsel

In his first issue, Qutiefan contends that the trial court erred by denying his request for a court-appointed attorney and forcing him to represent himself at trial. He contends that he did not know how to present evidence properly. He acknowledges that the trial court appointed him counsel during the enforcement proceedings, but that representation was limited to those proceedings and did not extend to trial. He argues that he diligently but unsuccessfully pursued pro bono counsel and that he filed numerous motions for continuances to obtain counsel, which were mostly denied. Safi responds that Qutiefan was not entitled to appointed counsel at trial. Safi further argues that Qutiefan was represented by three different private attorneys during the divorce proceedings, all of whom withdrew from his case, and that he had ample opportunity and resources to hire legal counsel.

### A.    Standard of Review and Governing Law

Under the Government Code, a district court has discretion to appoint counsel to an indigent party in a civil case, but the Texas Supreme Court has not recognized a right to counsel in civil cases. *See* TEX. GOV'T CODE § 24.016 ("A district judge

---

[2]    After the parties filed their briefs, the Court abated this case on Qutiefan's suggestion of bankruptcy. *See* TEX. R. APP. P. 8.1, 8.2. The appeal was reinstated in January 2021. *See* TEX. R. APP. P. 8.3(a).

may appoint counsel to attend to the cause of a party who makes an affidavit that he is too poor to employ counsel to attend to the cause."); *Traveler's Indem. Co. of Conn. v. Mayfield*, 923 S.W.2d 590, 594 (Tex. 1996) ("While a court has a duty to ensure that 'judicial proceedings remain truly adversarial in nature,' we have never held that a civil litigant must be represented by counsel in order for a court to carry on its essential, constitutional function.") (internal citations omitted). A court also has inherent authority, "in some exceptional cases," to appoint counsel in a civil case in which "the public and private interests at stake are such that the administration of justice may best be served by appointing a lawyer to represent an indigent civil litigant." *Mayfield*, 923 S.W.2d at 594. No provision of the Family Code requires a court to appoint counsel for the trial of a divorce case, although the Code does require appointment of counsel for an indigent respondent in enforcement proceedings in certain limited circumstances. TEX. FAM. CODE § 157.163(a), (b), (d), (e), (i).

## B. Analysis

Qutiefan filed several pretrial documents entitled "Request to Invoke Sixth Amendment Constitutional Right," in which he claimed indigency and requested that the court appoint him counsel. The court denied his motions, although the record indicates that Qutiefan was represented by counsel during the enforcement

15

proceedings prior to trial. At trial, Qutiefan did not make a request for appointed counsel; instead, he repeatedly requested continuances to hire counsel.

Qutiefan was not entitled to appointment of counsel at trial, and he does not show on appeal that his case was exceptional and that the administration of justice was best served by appointing him counsel. *See Mayfield*, 923 S.W.2d at 594. The mere fact that he represented himself is not exceptional. *See id.* ("Indeed, thousands of cases each year are prosecuted in our courts by pro se litigants."). We therefore conclude that, to the extent Qutiefan made a request for appointment of counsel at trial, the trial court did not abuse its discretion in denying his request. We overrule Qutiefan's first issue.

## Motions for Continuance

In his second issue, Qutiefan argues that the trial court erred by denying his motions for continuances to hire legal counsel and coercing him to represent himself.

## A. Standard of Review and Governing Law

We review the grant or denial of a motion for continuance for an abuse of discretion. *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986). We will uphold the trial court's decision absent a clear abuse of discretion. *Id.* A court abuses its discretion by acting unreasonably or in an arbitrary manner without reference to any guiding rules and principles. *Landers v. State Farm Lloyds*, 257 S.W.3d 740, 747

(Tex. App.—Houston [1st Dist.] 2008, no pet.) (quoting *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991)).

When a party moves for a continuance to obtain legal counsel, he must show that the failure to be represented at trial was not due to his own fault or negligence. *See Villegas*, 711 S.W.2d at 626; TEX. R. CIV. P. 253 ("[A]bsence of counsel will not be good cause for a continuance or postponement of the cause when called for trial, except it be allowed in the discretion of the court, upon cause shown or upon matters within the knowledge or information of the judge to be stated on the record.").

## B. Analysis

Qutiefan filed four written motions for continuances prior to trial, but none were based on Qutiefan's need to hire counsel. During trial, however, Qutiefan made numerous oral requests for continuances to obtain counsel, which the court denied. The court explained to Qutiefan that trial had been reset for nearly two years, during which time he had ample opportunity to hire private counsel. Moreover, trial began on July 13, 2017, but did not proceed over consecutive days. Rather, it was spread out over five weeks, ending on August 21, which provided Qutiefan additional time during trial to hire counsel. Qutiefan had also been represented by at least three private attorneys prior to trial. Qutiefan offers no argument on appeal that his failure to have legal representation at trial was not due to his own fault or negligence. *See Villegas*, 711 S.W.2d at 626.

Qutiefan had adequate opportunity to hire legal counsel not only in the two years prior to trial when he had notice of the impending trial, but also in the five weeks between the first and last days of trial. We also note that the trial court granted Qutiefan's request for a continuance when he claimed to be ill during trial, even though the doctor's note he provided showed no malady. We conclude that the trial court did not abuse its discretion in denying Qutiefan's oral motions for continuances to obtain legal counsel during trial. We overrule Qutiefan's second issue.

**Due Process**

In his third issue, Qutiefan contends that he was denied his right to present testimony and documentary evidence, which raises an issue of constitutional due process. He argues that the trial court cut his testimony short, that the court did not admit most of his evidence, and that had he been allowed to finish his testimony and present all his evidence, the outcome of the trial would have been different. Safi responds that the trial court allowed Qutiefan to provide narrative testimony, cross-examine witnesses, call his own witnesses, and present documentary evidence, and that Qutiefan points to no particular evidence that the court prohibited him from offering.

**A.** **Standard of Review and Governing Law**

Whether a party was deprived of a constitutional right presents an issue of law that we review de novo. *Scally v. Tex. State Bd. of Med. Exam'rs*, 351 S.W.3d 434,

18

446 (Tex. App.—Austin 2011, pet. denied). The United States and Texas Constitutions prohibit the deprivation of life, liberty, and property from any person without due process of law. U.S. CONST. amend. XIV, § 1; TEX. CONST. art. 1, § 19. The right to be heard is a fundamental concept of due process, and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner. *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972); *Perry v. Del Rio*, 67 S.W.3d 85, 92 (Tex. 2001). Generally, the right to be heard includes the rights to a full and fair hearing before a court with jurisdiction, to introduce evidence at a meaningful time and in a meaningful manner, and to produce and cross-examine witnesses. *Perry*, 67 S.W.3d at 92.

## B. Analysis

Qutiefan appeared pro se at trial. He cross-examined each of Safi's witnesses, including Safi for four days and an additional day when he recalled her as a witness. Qutiefan repeatedly asked Safi the same questions that she had already answered. On the third day of Safi's cross-examination, the court gave Qutiefan notice that he could cross-examine her for an additional twenty minutes. Qutiefan called Safi back to testify during his case in chief. After Qutiefan asked numerous questions that Safi had already answered, the trial court told Qutiefan that he had two hours remaining to question Safi. Qutiefan also cross-examined Safi's attorney on the issue of

19

attorney's fees, and counsel answered all of his questions except those that asked about privileged conversations.

Safi's counsel objected at various times to Qutiefan's questions, and the court overruled many of her objections in order to give Qutiefan "latitude" in his questioning. When Safi attempted to refuse to answer Qutiefan's question about the contents of her safety deposit box, the court ordered her to answer and admonished her that the court would hold her in contempt if she continued refusing to answer the question. She answered the question.

The trial court also allowed Qutiefan to testify in narrative form during his case-in-chief. In the middle of his testimony, the court allowed Qutiefan to call a witness, Alkhateeb, out of order even though Qutiefan had not produced a witness list. The court did not limit Qutiefan's questioning of any of his witnesses except for the time limit placed on his lengthy, multiple-day examinations of Safi. And even then, the court provided advance notice to Qutiefan of the time limit. Qutiefan did tell the court that he had additional witnesses who were out of the country, but the court told Qutiefan that he had had more than two years' notice of trial and that trial had started more than one month before he began his case in chief. The record therefore indicates that the trial court was generous with Qutiefan's examination of the witnesses. We conclude that the court did not violate Qutiefan's right to produce and cross-examine witnesses. *See id.*

Qutiefan also attempted to introduce more than thirty exhibits into evidence. The trial court admitted some of them, including an untranslated Arabic text message, photographs of damage to the interior of the parties' house, certain financial information, and some of Safi's discovery responses. The trial court did not admit many of Qutiefan's exhibits after sustaining Safi's and the Attorney General's objections to lack of predicate and relevance, among other objections. Qutiefan repeatedly complained that he did not know how to introduce evidence and that he did not understand what a predicate is, and the court explained that it could not provide him legal advice. However, the court told Qutiefan that he could attempt to reintroduce unadmitted evidence if he wished. On appeal, Qutiefan does not say what specific evidence that was not admitted may have changed the outcome of the trial. We therefore conclude that the court did not violate Qutiefan's right to introduce evidence at a meaningful time and in a meaningful manner. *See id.* We overrule Qutiefan's third issue.

## Conservatorship

In his fourth issue, Qutiefan argues that "doubts" exist regarding Safi's fitness to exercise sole managing conservatorship of the parties' four youngest children who are disabled and have special needs. He contends that he addressed the children's medical needs prior to the parties' separation and that, after the separation, the children's conditions deteriorated. He further argued that Safi hid the children from

21

him, alienated them against him, and spoke ill of him. Safi responds that the trial court did not abuse its discretion in its conservatorship decision because trial lasted seven days, the trial court interviewed the four youngest children in chambers in determining their best interests, and Qutiefan had a history of family violence, criminal conduct, and lack of involvement in the children's lives.

## A. Standard of Review

Like most family law issues, we review conservatorship awards for an abuse of discretion. *Whitworth v. Whitworth*, 222 S.W.3d 616, 622–23 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). As stated above, a trial court abuses its discretion by acting unreasonably or in an arbitrary manner without reference to any guiding rules and principles. *Landers*, 257 S.W.3d at 747.

In family law cases, legal and factual sufficiency challenges are not independent grounds for asserting error, but they are relevant factors in determining whether the trial court abused its discretion. *Cohen v. Bar*, 569 S.W.3d 764, 773 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). Our legal-sufficiency review considers all the evidence in a light favorable to the finding, crediting favorable evidence if a reasonable factfinder could do so and disregarding evidence unless a reasonable factfinder could not do so. *Id.* at 773–74 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005), and *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex.

App.—Houston [1st Dist.] 2007, no pet.)). In a factual sufficiency review, we consider all the evidence for and against the challenged finding and set the finding aside only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *Id.* at 774 (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)). If some evidence of a substantive and probative character exists to support the trial court's decision, there is no abuse of discretion. *Id.*

The factfinder is the sole judge of witnesses' credibility and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819; *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.) ("In a bench trial, the trial court, as factfinder, is the sole judge of the credibility of the witnesses."). The factfinder may resolve inconsistencies in witness testimony, regardless of whether such inconsistencies result from contradictory accounts by multiple witnesses or from internal contradictions in the testimony of a single witness. *Guimaraes v. Brann*, 562 S.W.3d 521, 549 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). The factfinder may also choose to believe one witness over another. *City of Keller*, 168 S.W.3d at 819. In conducting our factual sufficiency review, we may not substitute our judgment for that of the factfinder. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

**B.     Governing Law**

The best interest of the child is the primary consideration in determining issues of conservatorship and possession of and access to the child. TEX. FAM. CODE § 153.002; *Lenz v. Lenz*, 79 S.W.3d 10, 14 (Tex. 2002). Courts consider several factors in determining a child's best interest, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the parents to promote the best interest of the child; (6) the plans for the child by the parent seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

In appointing conservators, the court must also consider whether a party has engaged in family violence. TEX. FAM. CODE § 153.005(c)(1). The Family Code provides a rebuttable presumption that appointing parents as joint managing conservators is in the best interest of the child, but a finding that one of the parents has committed family violence rebuts the presumption. *Id.* § 153.131(b). A court may not appoint a parent as joint managing conservator if credible evidence is presented of a history or pattern of physical abuse by the parent against the other

24

parent or a child, and the court may consider family violence in determining whether to deny or limit possession of the parent. *Id.* § 153.004(b).

## C. Analysis

Safi testified that, after the parties divorced, she and all five children moved out of the parties' house and she had been the children's sole caretaker since then. She testified that Qutiefan did not support her or the children during the parties' marriage or after their separation, and he rarely saw the children. She testified that Qutiefan would not exercise his visitation rights and that, when he did see the children, they would return upset because Qutiefan slept a lot, there was no food in the house, the air conditioning did not work, and the house was dirty. Safi also testified that she did not work but was able to support herself and the children on food stamps and social security benefits for the disabled children. She was able to find living accommodations for herself and the children and to buy two vehicles, and she testified that the children's conditions had improved since the parties separated. She also testified that Qutiefan physically and verbally abused her and the children and that she had obtained protective orders against Qutiefan, which were admitted into evidence. *See id.* §§ 153.004(b), 153.131(b). The trial court also interviewed the children in chambers in determining their best interest. The trial court appointed Safi as sole managing conservator.

Safi's testimony and the trial court's interview of the children is legally sufficient to show that the children desired to live with Safi, that she met their emotional and physical needs, that Qutiefan presented emotional or physical dangers to the children, that Safi was able to care for the children and had a plan to do so, and that she provided a stable home environment to the children. *See Holley*, 544 S.W.2d at 371–72; *Cohen*, 569 S.W.3d at 773–74.

Qutiefan testified that Safi had mental health issues, which had deteriorated since the parties' separation, and that he had addressed the children's medical needs prior to the separation. Qutiefan did not present any documentary evidence to support his testimony. He offered no testimony about the children's desires, their emotional and physical needs, his plans for the children, or whether his home provided a stable environment for the children. *See Holley*, 544 S.W.2d at 371–72. Although Qutiefan and Safi testified inconsistently with each other, the trial court as factfinder was the sole judge of their credibility and could choose to believe Safi over Qutiefan. *See City of Keller*, 168 S.W.3d at 819; *Guimaraes*, 562 S.W.3d at 549. We may not substitute our judgment for that of the factfinder. *Jackson*, 116 S.W.3d at 761. Safi's testimony and evidence were not so weak that the court's appointment of her as sole managing conservator was clearly wrong or manifestly unjust. *See Cohen*, 569 S.W.3d at 774. Thus, the evidence was factually sufficient to support the trial court's conservatorship ruling.

Because the evidence was legally and factually sufficient to support the conservatorship determination, we hold that the trial court did not abuse its discretion in appointing Safi as sole managing conservator of the parties' children. *See id.* at 773. We overrule Qutiefan's fourth issue.

## Division of Property

Finally, in his fifth issue, Qutiefan argues that the trial court erred in dividing the parties' marital estate. He contends that Safi obtained community assets unjustly, unfairly, and inequitably, and that she mismanaged and misappropriated community assets. Safi responds that the trial court did not abuse its discretion in dividing the parties' community estate because the evidence showed a disparity in the parties' earning capacities and income, Safi's needs in caring for the children, the children's disabilities, and Qutiefan's misuse of community property. Furthermore, Safi contends that she presented evidence of the value of the marital estate and that Qutiefan dissipated the marital estate by wasting community funds, neglecting the parties' house, and causing fines and a judgment against the property due to unpaid HOA violations.

## A. Standard of Review and Governing Law

We review a trial court's division of property in a divorce case for abuse of discretion using the standard stated above. *Raymond v. Raymond*, 190 S.W.3d 77,

27

82 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (citing *Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex. 1998)); *see Landers*, 257 S.W.3d at 747.

The Family Code requires a court to divide community property in a just and right manner having due regard for the rights of each party and any children of the marriage. TEX. FAM. CODE § 7.001; *Schlueter*, 975 S.W.2d at 588. A just and right division of property may be disproportionate depending on the circumstances. *Schlueter*, 975 S.W.2d at 588. In dividing community property, courts may consider several factors, such as: (1) the spouses' abilities to support themselves, including which spouse has custody of the children, the burden of the care and maintenance of the children, and the spouses' education and employability; (2) a spouse's wrongdoing, including fault in the breakup of the marriage and tortious conduct by one spouse against the other; (3) financial costs incurred by a spouse while the divorce suit is pending; and (4) other considerations, including the nature of the property. *Twyman v. Twyman*, 855 S.W.2d 619, 625 (Tex. 1993) (plurality op.); *Murff v. Murff*, 516 S.W.2d 696, 698–99 (Tex. 1981); *Vannerson v. Vannerson*, 857 S.W.2d 659, 669 (Tex. App.—Houston [1st Dist.] 1993, writ denied).

**B.     Analysis**

The final divorce decree awarded the parties' house and the uncashed insurance check to Safi, required her to use the insurance check to make repairs to the house and then sell it, and awarded Safi 60% and Qutiefan 40% of the proceeds

28

of the sale of the house. As stated above, the decree also awarded Safi custody of the parties' children.

Safi testified that she did not work because she had to care for the parties' four permanently disabled children. Her only income was the children's social security benefits and food stamps. She introduced into evidence a financial information sheet stating her lack of income. Safi testified that Qutiefan did not support her or the children during their marriage or after their separation even though he had the financial ability to do so from his job as an accountant. The court's enforcement order showed that Qutiefan had not paid more than $14,000 in child support over thirty-five months prior to trial. Safi also testified that Qutiefan physically and verbally abused her.

Safi asked the court to award her 60% of the proceeds of the sale of the house, and she presented evidence showing the parties had approximately $16,000 in equity in the house. She testified that Qutiefan did not repair the house after it was damaged during Hurricane Ike and that Qutiefan did not spend insurance proceeds on repairs to the house. Qutiefan's own photographs of the house showed significant damage to it. Further, Qutiefan admitted that the roof had holes in it and the house had water leaks and missing flooring as of the time of trial. Safi's testimony and evidence is legally sufficient to show that her ability to support herself and the children is limited, that the four youngest children have significant care and maintenance needs

due to their permanent disabilities, that Qutiefan engaged in tortious conduct against her, and that she incurred costs while the divorce was pending. *See Twyman*, 855 S.W.2d at 625; *Murff*, 516 S.W.2d at 698–99; *Vannerson*, 857 S.W.2d at 669; *see also Cohen*, 569 S.W.3d at 773–74.

Qutiefan testified at trial that Safi spent money from the insurance proceeds that were intended to repair the house. Safi conceded that Qutiefan paid the mortgage. Qutiefan also accused Safi of lying in all of her testimony. However, he did not present any evidence substantiating his testimony. To the extent his testimony conflicted with Safi's testimony, the trial court as factfinder was the sole judge of the parties' credibility and could choose to believe Safi over Qutiefan, and we may not substitute our judgment for that of the factfinder. *See City of Keller*, 168 S.W.3d at 819; *Jackson*, 116 S.W.3d at 761; *Guimaraes*, 562 S.W.3d at 549. Safi's testimony and evidence were not so weak that the court's disproportionate division of the parties' community property was clearly wrong or manifestly unjust. *See Schlueter*, 975 S.W.2d at 588; *Cohen*, 569 S.W.3d at 774. Thus, the evidence was factually sufficient to support the trial court's division of property.

We note that the trial court did not award Safi all the relief she requested. For example, the trial court awarded her $391 per month in child support, much less than the $1,500 she requested, and it denied Safi's request for recovery on the parties' dowry contract and her request for spousal maintenance. Because the evidence is

30

legally and factually sufficient to support the trial court's division of property, we hold that the trial court did not abuse its discretion in dividing the parties' community estate. *See Cohen*, 569 S.W.3d at 773. We overrule Qutiefan's fifth issue.

## Conclusion

We affirm the trial court's final decree of divorce.

April L. Farris
Justice

Panel consists of Chief Justice Radack and Justices Goodman and Farris.